UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                                :
HILDA L. SOLIS, Secretary of Labor, United States              :
Department of Labor,                                            :
                                                                :           10 Civ. 7242 (PAE)
                                            Plaintiffs,          :
                          -v-                                   :           OPINION AND ORDER
                                                                :
CINDY'S TOTAL CARE, INC., d/b/a CINDY'S NAM                    :
SAENG SIM, NAM SAENG SIM, individually, and                   :
BYUNG SOOK KIM, individually,                                  :
                                                                :
                                            Defendants.         :
                                                                :
------------------------------------------------------------------------X


**PAUL A. ENGELMAYER, District Judge:**


        This opinion sets forth the Court's findings of fact and conclusions of law pursuant to

Federal Rule of Civil Procedure 52, following a three-day nonjury trial in this case, brought

under the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq*. ("FLSA" or the "Act").

        The Secretary of Labor ("the Secretary") brought this action following an investigation of

Cindy's Total Care, Inc. ("Cindy's"), a nail-care salon operating in New York City.  The

Department of Labor initiated its investigation after receiving complaints from employees, who

alleged that Cindy's was failing to pay overtime wages, and failing to maintain complete and

accurate records as to employee hours and compensation.

        The Secretary alleges that Cindy's violated the FLSA between September 20, 2007 and

February 28, 2010, in two respects. First, she alleges that Cindy's willfully failed to pay its

employees the statutorily-required overtime rate (one and one-half times the employee's base

rate) for all hours worked in excess of 40 per week, and instead paid employees a daily wage rate

regardless of the total number of hours worked, in violation of regulations implementing the FLSA. *See* 29 C.F.R. § 778.114. As a remedy for these violations, the Secretary seeks an award of back wages and liquidated damages. Second, the Secretary alleges that Cindy's failed to maintain complete and accurate wage and hour records. The defendants—Cindy's, its owner Nam Saeng Sim, and her husband Byung Sook Kim—dispute these claims. They assert that Cindy's employees were paid an hourly wage rate, and that all overtime hours were compensated at the required overtime rate. They further assert that Cindy's kept compliant records as to wages and hours.

The parties tried the case before the Court between November 29 and December 1, 2011. Each witness's direct testimony was received in the form of a sworn declaration; cross-examination was live. The Secretary called nine witnesses: three Department of Labor investigators and six employees of Cindy's. The employee witnesses, none of whom speaks English, each testified with the assistance of a translator. Defendants called Ms. Sim and Cindy's accountant David Shin; Ms. Sim testified with the assistance of a translator. Mr. Kim did not testify.

For the reasons set forth below, the Court finds that Cindy's and Ms. Sim violated the recordkeeping and overtime pay obligations of the FLSA and regulations promulgated thereunder. On the basis of these violations, the Court awards back wages to 32 current and former employees of Cindy's, as well as statutory liquidated damages. The Court also enjoins Cindy's and Ms. Sim from further violating the FLSA. The Court does not, however, find Mr. Kim liable.

[2]

## FINDINGS OF FACT

### I.  Background

#### A.  *The Parties*

1.  Plaintiff Hilda Solis is the Secretary of Labor.  She filed this action pursuant to the FLSA, alleging that the defendants violated the Act from at least September 20, 2007 to February 28, 2010 ("the relevant period"), and owe back wages and liquidated damages accruing from that period.[1]

2.  The Secretary commenced this action after conducting an investigation of Cindy's, a nail salon business located in New York City, operating under the corporate name Cindy's Total Care, Inc. and doing business as Cindy's.  *See* Joint Pretrial Order, Stipulations of Fact ¶¶ 2–4 ("Joint Stip. of Fact").

3.  Cindy's is operated by defendant Nam Saeng Sim (also known as Cindy).  Ms. Sim is the sole owner, sole officer, and president of Cindy's Total Care, Inc.  *See* Joint Stip. of Fact ¶¶ 1, 6–8.

4.  Ms. Sim has operated multiple nail salons.  In recent years, Ms. Sim's nail salons have been operated under a variety of corporate names, including: Cindy's Nail and Plus, Inc., SunYoung's Nail and Plus, Inc., Amsterdam Nail Services, LLC, and Cindy's Total Care, Inc. *See* Second Amended Declaration of Debbie Lau, Pl. Ex. 2 ¶ 7 ("Lau Decl.").  The entities

---

[1] In her Complaint, filed September 20, 2010, the Secretary initially sought backpay for FLSA violations committed by the defendants during a longer period: July 1, 2007 through the date of the Complaint.  After trial, the Court asked the Secretary to clarify the dates covered by this action, noting that the FLSA has a three-year statute of limitations for willful violations and that July 1, 2007 was more than three years before the date on which the Complaint was filed.  In a letter to the Court dated December 7, 2011, the Secretary amended the time period for which she sought damages, narrowing it to the period between September 20, 2007 and February 28, 2010.

relevant to this decision are Cindy's Total Care, Inc., which came into existence in October

2007, and Cindy's Nail and Plus, Inc., which existed from approximately August 2002 until

October 2007.  *See* Defs.' Proposed Findings of Fact ¶ 7.  Unless stated otherwise, references to

Cindy's will refer to defendant Cindy's Total Care, Inc.

     5.  Cindy's is currently located at 491 Amsterdam Avenue, New York, NY.  *See* Joint

Stip. of Fact ¶ 4.  Prior to operating in the present location, Cindy's was located at 170 West 83rd

Street, New York, N.Y., where it maintained the same business.  *See* Deposition of Nam Saeng

Sim 15:25–16:8.  Ms. Sim owned and operated Cindy's at 170 West 83rd Street, and she

currently owns and operates Cindy's at 491 Amsterdam Avenue.  During the relevant time

period, Cindy's employees—nail salon technicians—have worked at both locations.

     6.  During the relevant period, Cindy's Total Care, Inc. has procured some materials and

supplies used by its employees from beauty supply distributors located outside of the state of

New York.  Joint Stip. of Facts ¶¶ 15–16.

     7.  During the relevant period, Cindy's has been a business or enterprise engaged in

interstate commerce with annual gross sales over $500,000.  *See* Cmpl. at 3; Defs.' Letter, Nov.

1, 2011 (Dkt. 43).[2]

---

[2] Before trial, defendants identified as an affirmative defense that Cindy's Total Care, Inc., which
first came into existence in October 2007, did not meet the statutory requirement of having
$500,000 gross revenue for that year.  At a status conference on October 13, 2011, the Secretary
stated that she planned to file a motion *in limine* to preclude that defense at trial, because
defendants refused to produce relevant financial records in discovery.  On November 1, 2011,
defendants wrote the Court stating that they had agreed to withdraw that defense and stipulate
that the $500,000 threshold was met.  The Court endorsed that letter and advised the parties that
it would treat the $500,000 statutory threshold as established.  *See* Defs.' Letter, Nov. 1, 2011
(Dkt. 43).  During trial, defense counsel moved to revoke that stipulation, so as to enable it to
question witnesses regarding Cindy's total revenues for 2007.  The Court denied the motion,
based on the earlier stipulation.  The parties have separately stipulated that Cindy's met the

8. During the relevant period, Ms. Sim actively controlled and managed Cindy's. Ms. Sim hired and fired employees, directed their work activities and work hours, and set their rates of compensation. Joint Stip. of Fact ¶¶ 9–12.

9. Defendant Byung Sook Kim assisted Ms. Sim in some aspects of her work. Mr. Kim occasionally wrote out paychecks to Cindy's employees. He occasionally, at the direction of Ms. Sim, handed checks to Cindy's employees, and asked employees to sign a receipt indicating that they had received their wages. On at least one occasion, Mr. Kim affixed a schedule of employee breaks to the wall in Cindy's. Mr. Kim on occasion sat at various locations in the nail salon, including by the cash register. Joint Stip. of Fact ¶¶ 18–20. Mr. Kim did not receive compensation from Cindy's during the relevant period. Joint Stip. of Fact ¶ 6; Sim Decl. ¶ 6.[3]

B. *The Employees*

10. The Secretary brings this action on behalf of 32 persons that were employed by Cindy's Total Care, Inc. between September 20, 2007 through February 28, 2010.[4]

---

$500,000 threshold from 2008 to 2010. *See* Defs.' Proposed Findings of Fact ¶ 14; Pl.'s Proposed Findings of Fact ¶ 14.

[3] The Secretary has asserted that Mr. Kim received payment for work at Cindy's. *See* Pl.'s Post-Trial Br. (Dkt. 49) at 11. However, the only check that the Secretary referenced in support of that claim is dated February 7, 2007, which pre-dates the relevant period. *See* Def. Ex. 1 at 23. The Court has reviewed all of the check records for Cindy's that were admitted at trial; it found no checks to Mr. Kim during the relevant period. *See generally* Def. Ex 1.

[4] At trial, the Secretary introduced a chart (Pl. Ex. 2(q)) that listed, *inter alia*, 33 employees and their dates of employment within the period covered by the Complaint. In her trial testimony, Ms. Sim confirmed the accuracy of these dates. *See* Tr. 469:2–473:24. Following trial, the Secretary narrowed the time period for which relief was sought, *see* n.1, *supra*, and submitted a revised chart consistent with that narrowed time period. *See* Pl. Post-Trial Br. (Dkt. 49), Ex. 1. The chart's representations that each listed employee worked at Cindy's during the corresponding period are consistent with Ms. Sim's testimony. As a result of the narrowed time period, two employees listed in Pl. Ex. 2(q), Ok Young Ko and Jacquelin Lee, appeared no

11.  Casta Rosalia Arias (also known as Katty) was employed by Cindy's from on or about August 11, 2008 through February 28, 2010.

12.  Jia Jin Chen (also known as Jenny) was employed by Cindy's from on or about May 18, 2009 through February 28, 2010.

13.  Lili Chiu was employed by Cindy's during the period September 20, 2007 through March 25, 2008.

14.  Vicky Doe was employed by Cindy's from on or about February 21, 2009 through February 28, 2010.

15.  Chun Hua Fu was employed by Cindy's during the period September 20, 2007 through December 29, 2007.

16.  Yi L. Gao was employed by Cindy's during the period September 20, 2007 through December 8, 2007.

17.  Mei Zi He (also known as Henna) was employed by Cindy's from on or about April 14, 2008 through February 14, 2009.

18.  Ambika Kayastha was employed by Cindy's during the period September 20, 2007 through February 28, 2010.

19.  Ok Young Ko was employed by Cindy's during the period September 20, 2007 through October 5, 2007.

---

longer within the scope of the case, because they were employed exclusively outside the relevant period, and therefore were omitted from the Secretary's revised chart.  However, the Court's review of the relevant time sheets revealed that Ms. Ko worked for the two weeks between September 20, 2007 and October 5, 2007, which is within the narrowed time period.  *See* Pl. Ex. 2(f) at 432–33.  As a result, the 32 employees identified in the ensuing paragraphs (including Ms. Ko) are within the scope of the Secretary's claims, as narrowed.

20.  Guo Hua Li (also known as Jessica) was employed by Cindy's during the period September 20, 2007 through April 10, 2009.

21.  Hou P. Li (also known as Lily) was employed by Cindy's during the period September 20, 2007 through December 29, 2007.

22.  Jin Li (also known as Michelle) was employed by Cindy's from on or about April 14, 2009 through February 28, 2010.

23.  Jin Chai Li (also known as Jennifer) was employed by Cindy's from on or about April 1, 2009 through February 28, 2010.

24.  Xiao Ying Li (also known as Sharon) was employed by Cindy's during the period September 20, 2007 through February 28, 2010.

25.  Yu Zhen Li (also known as Julie) was employed by Cindy's during the period September 20, 2007 through February 28, 2010.

26.  Mei Fang Lin (also known as Jackie) was employed by Cindy's from on or about May 6, 2009 through February 28, 2010.

27.  Ai Zhu Liu (also known as Amy) was employed by Cindy's during the period September 20, 2007 through February 28, 2010.

28.  Hui Fang Liu (also known as Linda) was employed by Cindy's during the period September 20, 2007 through February 28, 2010.

29.  Xiang Hua Liu (also known as Mary) was employed by Cindy's during the period September 20, 2007 through February 28, 2010.

30.  Xiao Qing Liu (also known as Sally) was employed by Cindy's from on or about May 19, 2009 through February 28, 2010.

[7]

31.   Xiang Mei Meng (also known as Lucy) was employed by Cindy's during the period September 20, 2007 through February 17, 2009.  Ms. Meng testified at trial regarding her employment at Cindy's.  *See* Declaration of Xiang Mei Meng, Pl. Ex. 8 ("Meng Decl.").

32.   Chun Li Peng was employed by Cindy's during the period September 20, 2007 through December 29, 2007.

33.   Ai H. Wang was employed by Cindy's during the period September 20, 2007 through December 29, 2007.

34.   Jun Wang was employed by Cindy's from on or about October 6, 2007 through December 29, 2007.

35.   Jing Qiu Wu was employed by Cindy's from on or about December 1, 2007 through December 29, 2007.

36.   Qi Wu (also known as Susan) was employed by Cindy's during the period September 20, 2007 through March 19, 2009.  Ms. Wu testified at trial regarding her employment at Cindy's.  *See* Declaration of Qi Wu, Pl. Ex. 7 ("Wu Decl.").

37.   Feng Ying Yeng (also known as Lulu) was employed by Cindy's during the period September 20, 2007 through September 1, 2008.  Ms. Yang testified at trial regarding her employment at Cindy's.  *See* Declaration of Feng Ying Yeng, Pl. Ex. 9 ("Yeng Decl.").

38.   Hong Yang (also known as Lulu) was employed by Cindy's during the period September 20, 2007 through August 31, 2008.

39.   Yu Feng Ye (also known as Lisa) was employed by Cindy's during the period September 20, 2007 through June 28, 2008.

[8]

40.  Ge Zhang (also known as Angie) was employed by Cindy's during the period September 20, 2007 through August 31, 2009.  Ms. Zhang testified at trial regarding her employment at Cindy's.  *See* Declaration of Ge Zhang, Pl. Ex. 10 ("Ge Zhang Decl.").

41.  Jie Hua Zhang (also known as Judy) was employed by Cindy's during the period September 20, 2007 through February 1, 2009.  Ms. Zhang testified at trial regarding her employment at Cindy's.  *See* Declaration of Jie Hua Zhang, Pl. Ex. 6 ("Zhang Decl.").

42.  Hua Zhu (also known as Maria) was employed by Cindy's during the period September 20, 2007 through February 28, 2010.  Ms. Zhu testified at trial regarding her employment at Cindy's.  *See* Declaration of Hua Zhu, Pl. Ex. 5 ("Zhu Decl.").

## II.  The Department of Labor's Investigations

43.  The Department's Wage & Hour Division investigated Cindy's (or its predecessor entities) three times between 2006 and the filing of the Complaint in this case.

44.  On or about September 22, 2006, Debbie Lau, Assistant District Director for the Wage and Hour Division, was assigned to investigate Cindy's Nail & Plus, Inc. (the "first investigation").  The investigation was prompted by an employee complaint that, among other things, Cindy's failed to pay overtime wages and did not maintain complete and accurate wage and hour records.  *See* Lau Decl. ¶ 3.

45.  On or about January 5, 2007, Ms. Lau met with Ms. Sim, Mr. Kim, and Cindy's then-accountant, Sung Yoon Pak.  Ms. Lau explained the FLSA's overtime wage and recordkeeping requirements.  She also explained that, based on the Department's investigation, Ms. Sim and Mr. Kim had failed to comply with the relevant provisions of the Act.  Ms. Lau also showed Ms. Sim, Mr. Kim, and Mr. Pak the Department's back wage calculations for the 26 employees then employed by Cindy's.  Ms. Lau also explained the steps required to bring

Cindy's into compliance with the FLSA's overtime and recordkeeping requirements.  *See* Lau Decl. ¶ 4.

46.  On or about March 2, 2007, Ms. Sim signed a Back Wage Compliance and Payment Agreement.  Ms. Sim agreed to, and did, pay $45,000 to the Department of Labor in back wages owed to the 26 employees.  The Department distributed these back wages to the 26 employees. *See* Lau Decl. ¶ 5.  The Back Wage Compliance and Payment Agreement contained the following representation from Ms. Sim: "The employer represents that it is presently in full compliance with the applicable provisions of the [FLSA], and will continue to comply therewith in the future."  Lau Decl. ¶ 5.

47.  On or about August 2008, the Department of Labor initiated a brief second investigation of Cindy's.  This was a "directed investigation," and was a standard follow-up procedure to the first investigation.  *See* Declaration of Sylvia Deng-Batista, Pl. Ex. 4 ¶ 7 ("Deng-Batista Decl.").  The Department initiates such investigations of employers that have previously been found to have violated the FLSA, to assess whether they are in compliance.  *See* Deng-Batista Decl. ¶ 2.

48.  On or about September 9, 2008, as part of the directed investigation, Silvia Deng-Batista, a technician for the Wage and Hour Division, was assigned to mail standard forms to Cindy's employees.  Deng-Batista Decl. ¶ 8.  The forms, WH-42, asked employees to supply (1) their job title; (2) their period of employment; (3) a description of their job duties; (4) their daily and weekly work hours; and (5) the amount and form of their wages.  Deng-Batista Decl. ¶ 5.

49.  Per its ordinary practice, the Department mailed these WH-42 forms to employees' home addresses.  *See* Deng-Batista Decl. ¶ 6.  The Department of Labor received completed WH-42 forms from eight employees of Cindy's.  Deng-Batista Decl. ¶ 9.

[10]

50.  On or about November 18, 2008, Ms. Lau received two complaints from employees of Cindy's.  They reported, *inter alia*, that Cindy's continued to pay its employees a flat daily wage rate, and did not pay extra for overtime work.  *See* Lau Decl. ¶¶ 6, 8.  Ms. Lau thereupon initiated another investigation of Cindy's (the "third investigation").

51.  On or about May 29, 2009, Ms. Lau and David An, an investigator with the Wage and Hour Division, made an unannounced visit to Cindy's salon and met with Ms. Sim.  At this meeting, Ms. Sim stated to Mr. An, among other things, that (1) all of Cindy's employees worked part-time, typically between five and six hours per day; (2) no employee worked more than 40 hours per week; (3) Ms. Sim typically called employees as the start of the day to tell them their work hours; (4) Cindy's had not made or maintained records of the hours worked by or the wages paid to its employees; and (5) Cindy's did not take any deductions from employees' wages.  *See* Declaration of David An, Pl. Ex. 3 ¶ 5 ("An Decl.").

52.  At the May 29, 2009 meeting, Ms. Lau presented Ms. Sim with a letter from the Department of Labor.  The letter stated that the Department was investigating Cindy's, and requested that she provide all records and other documents setting forth wages paid to, hours worked by, and deductions taken from the wages of, all employees.  *See* Lau Decl. ¶ 11.

53.  On or about June 15, 2009, Ms. Lau met again with Ms. Sim and Mr. Kim, who brought with them documents that appeared to be wage and hour records.  *See* Lau Decl. ¶ 13. The existence of these records appeared to contradict Ms. Sim's May 29 representation that Cindy's had not made or maintained such records; as Cindy's counsel explained at trial, the documents produced on June 15 were actually "reconstructions" of prior wage and hour information that had been created in response to the Department of Labor's request.  *See* Tr. 462:6–23.  These records purported to show that all employees worked only a part-time

[11]

schedule, *i.e.*, less than 40 hours a week.  Ms. Lau took custody of these records.  These records are referred to herein as the "first production of documents."

54.  At the June 15, 2009 meeting, Ms. Lau also took an oral statement from Ms. Sim, and simultaneously recorded the statement in writing on a Department of Labor interview intake form.  *See* Lau Decl. ¶ 14.   The form reflects that Ms. Sim stated: "There is no time record for hours worked, but I know how many hours that the worker worked by memory"; and "[t]he employee[s] are working part-time."  Pl. Ex. 2(h).  Ms. Sim consented to the accuracy of the recorded statement; she signified this by signing the bottom of the interview intake form.

55.  At the June 15, 2009 meeting, Ms. Lau told Ms. Sim and Mr. Kim that she had determined that they had violated the recordkeeping requirements of the FLSA.  Ms. Lau explained that she had made this determination based on Ms. Sim's own statement that she did not make wage and hour records, and the fact that the records produced by Ms. Sim that day were inconsistent with the information employees had given as to their hours and pay.  In response, Ms. Sim and Mr. Kim admitted that they did not make or maintain the records required by the FLSA.  *See* Lau Decl. ¶ 15.

56.  On or about June 26, 2009, Ms. Lau visited Cindy's to return the original records provided by Ms. Sim during their prior meeting.  While at Cindy's, Mr. Kim gave Ms. Lau a copy of the current employees' work schedule which was hanging on a wall and time sheets for the employees that were working.  Upon inspecting those documents, Ms. Lau observed that the time sheet for that day showed that only one person was scheduled to work, whereas the posted work schedule showed that three people were scheduled to work.  Ms. Lau observed that, in fact, nine Cindy's employees were working at the salon during her visit.  *See* Lau Decl. ¶ 16.

[12]

57.  On or about December 1, 2009, Ms. Lau met with David Shin, Cindy's accountant. Cindy's had authorized Mr. Shin to be her representative in connection with the investigation. Mr. Shin stated that he had "actual" payroll records in his possession, and, contrary to Ms. Sim's earlier admissions, that Cindy's was in compliance with the FLSA.  *See* Lau Decl. ¶ 17.

58.  On or about December 3, 2009, Mr. Shin sent a letter, by facsimile, to Ms. Lau.  Mr. Shin's letter stated that the payroll records that Ms. Sim and Mr. Kim had presented at the June 15, 2009 meeting had not been the "real and actual payroll records."  Lau Decl. ¶ 18.  The letter attached four pages of time sheets which Mr. Shin represented were accurate.

59.  On or about December 29, 2009, Ms. Lau and Mr. An met with Ms. Sim, Mr. Kim, and Mr. Shin.  Mr. Shin presented Ms. Lau and Mr. An with yet additional Cindy's payroll records.  *See* Lau Decl. ¶ 19.  Mr. Shin stated that these records came from the same batch as the four time sheets he had sent Ms. Lau on December 3, 2009.  These records are referred to herein as the "second production of documents."

**III.  Recordkeeping Practices at Cindy's**

60.  The Court finds that, during the relevant time period, Cindy's failed to make, keep, and preserve complete and accurate records of the wages paid to and hours worked by their employees.  This finding is based on (1) Ms. Sim's repeated admissions to investigators that Cindy's did not maintain such records; and most importantly, (2) the Court's close analysis of the purported wage and hour records that Cindy's belatedly produced.

　　　　*A.  The First Production of Records, Submitted on June 15, 2009*

61.  At the conclusion of the May 29, 2009 meeting at which Ms. Sim admitted that Cindy's neither made nor maintained any records of the hours its employees worked or the

[13]

wages they earned, Ms. Lau gave Ms. Sim a letter requesting that Cindy's produce any and all

wage and hour records by June 1, 2009.[5]

   62.   At their June 15, 2009 meeting, Ms. Sim acknowledged in writing her May 29

statement to Ms. Lau that Cindy's did not make or maintain records of employee wages or hours.

*See* Pl. Ex. 2(h); Lau Decl. ¶ 14.   At that same meeting, on June 15, 2009, Ms. Sim presented

Ms. Lau with the first production of documents.   *See* Pl. Ex. 2(f).   Ms. Lau asked Ms. Sim why

she had denied maintaining records, but was now producing them.   Ms. Sim did not explain this

obvious inconsistency; she merely shrugged her shoulders.   *See* Tr. 345:5–14.

   63.   The Court finds that Cindy's first production of records consists of hour and wage

records that are blatantly and demonstrably inaccurate and incomplete—and that were plainly

created long after the events described therein.   These records almost entirely reflect that (1)

Cindy's employees worked a part-time schedule of less than 40 hours per week,[6] and (2) Cindy's

employees worked shifts of less than 10 hours in duration.[7]   However, such assertions are flatly

contradicted by other persuasive evidence in this case.   Most notably, the defendants themselves,

before trial, stipulated that Cindy's employees each worked 10-hour shifts five or six days per

week during the relevant period.   Joint Stip. of Fact ¶¶ 23–24.   Further, every single employee

---

[5] Employers are required to furnish to the Department of Labor all wage and hour records within
72 hours of the time of the request.   *See* 29 C.F.R. § 516.7.

[6] *See, e.g.*, Pl. Ex. 2(f) at 703–18 (showing that Ambika Kayastha worked 30 hours per week for
32 weeks in 2008–2009); *id.* at 799–844 (showing that Ai Zhu Liu worked less than 34 hours per
week for 72 weeks in 2007–2009); *id.* at 928–34 (showing that Yu Feng Ye worked for exactly
39.67 hours per week for 14 weeks in 2007).

[7] *See, e.g.*, Pl. Ex. 2(f) at 719–36 (showing that Jin Chai Li worked four 5-hour shifts per week
for 36 weeks in 2008); *id.* at 886–900 (showing that Qi Wu worked five 5-hour shifts per week
for 30 weeks in 2008); *id.* at 957–61 (showing that Jie Hua Zhang worked one 7-hour shift and
three 8-hour shifts per week for 10 weeks in 2008).

witness testified at trial, credibly, that employees typically were assigned a 10-hour shift—and in fact often worked more than 10 hours per workday—and were scheduled by Cindy's to work (and did work) either five or six shifts each week.[8]  The Court finds that the time sheets contained within the first set of records that indicate to the contrary—which represent the significant majority of that set—are inaccurate.

64.  The records produced on June 15, 2009 also represent that Cindy's employees were paid an hourly wage.  But the other evidence forcefully contradicts that claim.  The employee witnesses uniformly and credibly testified that they were not paid by the hour, but instead received a flat daily wage.[9]  Several employees testified that Ms. Sim explicitly told them that their compensation would consist of a flat daily wage.[10]

65.  Further, upon close examination, the purportedly-accurate time sheets produced on June 15, 2009 in fact reveal that Cindy's paid its workers a daily wage, not an hourly one.  Many of these time sheets represent that the employee in question worked a curious number of hours during the week, with aggregate weekly hours expressed in fractions not consistent with ordinary employment practices.  *See, e.g.*, Pl. Ex. 2(f) at 232–38 (showing that Jun Wang worked 25.25 hours per week for 13 weeks in 2007); *id.* at 240–41 (showing that Jing Qiu Wu worked 23.15 hours per week for four weeks in 2007); *id.* at 252–67 (showing that Xiang Mei Meng worked 26.65 hours per week for 14 weeks in 2007); *id.* at 651–75 (showing that Gou Hua Li worked

---

[8] *See* Ge Zhang Decl. ¶¶ 12, 21; Meng Decl. ¶¶ 18, 20, 26; Wu Decl. ¶¶ 17, 19, 27, 34; Yeng Decl. ¶¶ 19–20; Zhang Decl. ¶¶ 19, 21–22, 27; Zhu Decl. ¶¶ 23, 25.

[9] *See* Ge Zhang ¶ 28; Meng Decl. ¶¶ 27; Wu Decl. ¶ 32; Yeng Decl. ¶ 28; Zhang Decl. ¶¶ 28–29; Zhu Decl. ¶ 32.

[10] *See* Ge Zhang Decl. ¶ 29; Zhu Decl. ¶ 32; Tr. 174:4–15; 259:6–9.

26.67 hours per week for 49 weeks in 2008–2009); *id.* at 799–801 (showing that Ai Zhu Liu worked 34.22 hours per week for five weeks in 2009); *id.* at 906–13 (showing that Qi Wu worked 14.38 hours per week for 16 weeks in 2007). *id.* at 944–56 (showing that Jie Hua Zhang worked 27.59 hours per week for 26 weeks in 2008).  Notably, in each instance where a time sheet reported an odd fractional number of hours, the employee's total weekly pay was reported as a whole number, such as $150 or $200.

66.  This pattern of data (with weekly hours measured in odd fractions and weekly compensation given as a whole number) on a belatedly-produced purported time sheet powerfully suggests that the time sheet was fabricated after the fact.  It suggests that the number of hours purportedly worked was derived retrospectively, by dividing the total amount of the employee's weekly wages by a fictitious hourly wage.  The Department of Labor has described this method of retrospectively falsifying records as the "backing-in" method.  *See* 29 C.F.R. § 778.114.  As the Department of Labor has explained, this tactic is commonly used by employers caught paying fixed daily wage rates, to create the false appearance that past wages had been paid hourly.  *See* Lau Decl. ¶ 26.  Ms. Lau testified, based on her experience, that Cindy's reporting of fractional hours in odd increments, such as 0.22 or 0.59 hours, is consistent with the "backing-in" method.  *See* Pl. Ex. 2(f) at 799–801, 944–56.

67.  Several examples convincingly demonstrate Cindy's improper "backing-in" of data in the records produced on June 15, 2009.  For example, Cindy's produced records purportedly reflecting 30 weeks of work by Xiang Mei Meng, covering the period June 30, 2008 through February 14, 2009.  *See* Pl. Ex. 2(f) at 252–67.  These records show that in each of those 30 weeks, Ms. Meng worked a total of 26.65 hours, comprised of four work shifts—three that lasted

6.50 hours, and a fourth that lasted 7.15 hours.  In each case, the 6.50 hour shift lasted from 9:00 a.m. to 3:30 p.m., and the 7.15 hour shift ran from 9:00 a.m. to 4:10 p.m.

68.  For a host of reasons, these records cannot be credited as an accurate reflection of Ms. Meng's actual hours.  The record supplies no explanation for an irregular work schedule such as Ms. Meng's purported schedule, including her having worked a 7.15 hour shift one day a week each week for 30 weeks.  On the contrary, the parties stipulated that each work shift at Cindy's is 10 hours in duration.  Nor was there any testimony, including from Ms. Sim, that she or her employees tracked hours worked to such unnatural fractions, such as twentieths or hundredths of an hour.[11]  Even Cindy's purportedly accurate time sheets do not reflect fractions consistent with a practice of reporting hours in increments consistent with Ms. Meng's.  Even if one assumed that  Ms. Sim simply was giving Ms. Meng credit for an extra 10 minutes worked on a particular week (a proposition for which there is no record support), one would not expect that pattern to recur weekly and only during the 7-hour shift.  In sum, Ms. Meng's reported weekly hours are totally implausible.

69.  It is far more likely that Ms. Sim or an agent of hers derived the number of hours reported on Ms. Meng's purported time sheets by using the backing-in method.  The records indicate that Ms. Meng was paid $200 per week.  While it is not plausible that Ms. Meng worked precisely 26.65 hours each week at an hourly wage rate of $7.50, including exactly one shift per week of exactly 7 hours and 10 minutes, it is quite plausible that she received a weekly wage of $200 regardless of the precise number of hours she worked that week.  In that scenario, Ms. Sim, or someone on her behalf, likely divided the $200 by an hourly wage rate invented after the fact,

---

[11] Further, the fraction reported for Ms. Meng is arithmetically wrong: 10 minutes, or one-sixth of an hour, does not equate to 0.15 of an hour, but rather 0.17 of an hour.

[17]

here $7.50, to arrive at 26.65 hours worked during the week.  The Court finds that the records

related to Ms. Meng are demonstrably false insofar as they reflect an hourly wage rate.  Far from

being contemporaneous and accurate records, these records were fabricated after the fact to

create a false impression of an hourly wage rate.

70.  The purportedly accurate time sheets for Gou Hua Li reflect a similar pattern.

Cindy's first production as to Ms. Li includes purported time sheets for 49 weeks of work,

spanning February 19, 2008 through January 31, 2009.  *See* Pl. Ex. 2(f) at 651–75.  The records

reflect that in each of those 49 weeks, Ms. Li worked a total of 26.67 hours, comprised of five

shifts: either four 5-hour shifts and one shift that lasted 6 hours and 40 minutes, or three 5-hour

shifts, one 5.5-hour shift, and one shift of 6 hours and 10 minutes.  The combination of these

unusual fractions, and daily hours which somehow translated every week into precisely 26.67

hours worked, is persuasive evidence of fabrication using the backing-in method.  *See* 29 C.F.R.

§ 778.114.  Notably, like Ms. Meng, Ms. Li's recorded $7.50 hourly wage resulted in a total

weekly wage of $200 for every week in the 49-week period.  The Court has observed many other

similar examples of time sheets reporting aggregate weekly hours in unusual fractions, consistent

with use of the backing-in method.

71.  Finally, defendants' own witness, accountant David Shin, admitted that Cindy's first

production was not contemporaneously created.   On December 3, 2009, Mr. Shin faxed to Ms.

Lau a letter explaining that the records that had been produced on June 15, 2009 were not "real

and actual payroll records reflecting labor law."  Lau Decl. ¶ 18.  And, at trial, defendants'

counsel admitted that these records were "reconstructions" of wage and hour records.  Tr.

476:25–481:7.  The Court finds that those records were not good-faith reconstructions, but rather

[18]

post-hoc fabrications designed to cover up Cindy's liability for substantive violations of the overtime pay requirements of the FLSA.

>    B. *The Second Production of Records, Submitted on December 3 and December 29, 2009*

72.  On December 1, 2009, Mr. Shin first claimed that Cindy's was in compliance with the FLSA and that he had its "actual" payroll records at his office.  He produced samples of those records on December 3, 2009, and additional records on December 29, 2009.  *See* Lau Decl. ¶¶ 17–19; Pl. Ex. 1(a)–(c).

73.  The Court finds that the documents (principally time sheets) belatedly provided in Cindy's second production are demonstrably inaccurate and incomplete.  First, and most important, the purported time sheets in this production again reflect that Cindy's employees were paid hourly wages, when the evidence as a whole overwhelmingly establishes that employees were paid a flat daily wage.[12]  Second, the majority of these time sheets purportedly reflect that each employee received a daily hour-long break.  In fact, the employee witnesses uniformly testified that this was not so, that employees received short breaks of up to 20 minutes, and that they were expected to be readily available at all times to serve customers.[13]  There is an obvious motive for Ms. Sim to falsely report that the employees receive a daily hour-long break; unlike shorter breaks, an employer need not compensate employees for longer rest periods.  *See* 29 C.F.R. § 785.18 ("Rest periods of short duration, running from 5 minutes to about 20 minutes . . .

---

[12] *See* Section III.A, *supra*; Ge Zhang ¶ 28; Meng Decl. ¶ 27; Wu Decl. ¶ 32; Yeng Decl. ¶ 28; Zhang Decl. ¶ 29; Zhu Decl. ¶ 32.

[13] *See* Ge Zhang Decl. ¶ 21; Meng Decl. ¶ 21; Wu Decl. ¶ 22; Yeng Decl. ¶ 21; Zhang Decl. ¶ 23; Zhu Decl. ¶ 26.

are customarily paid for as working time. They must be counted as hours worked."); 29 C.F.R. §
785.19 ("Bona fide meal periods are not worktime. . . . These are rest periods. The employee
must be completely relieved from duty for the purposes of eating regular meals.").  Based on the
unambiguous employee testimony, the Court finds that time sheets that reflect an hour-long
break are inaccurate as to that break.

74.  Separately, each of the employee witnesses testified to the effect that they in fact
worked in excess of 10 hours per day.  *See* Ge Zhang Decl. ¶ 12; Meng Decl. ¶¶ 18, 20, 26; Wu
Decl. ¶¶ 17, 19, 27, 34; Yeng Decl. ¶¶ 19–20; Zhang Decl. ¶¶ 19, 21–22, 27; Zhu Decl. ¶¶ 23,
25.  The Court credits this testimony, yet the second production does not reflect workdays
exceeding 10 hours.[14]

75.  Finally, these records are inconsistent with the first set of records, for which Cindy's
also vouched.  This blatant inconsistency alone would establish liability for maintaining and
producing false records.[15]  To be sure, Cindy's second production is more nearly accurate than
the first, in that it accords with the parties' trial stipulation, and in that it reflects that the

---

[14] Cindy's counsel, at trial, established, and emphasized, that a number of the time sheets in the
second production bear the employee's signature.  The employees, however, testified that in
signing these time sheets at Ms. Sim's request, they did not understand themselves to be
representing the precise hours that they in fact worked.  Further, as noted, the employees do not
speak or read English, and consistently needed the translator's help at trial to understand
English-language documents.  The Court therefore does not find that, in signing their names, the
employees intended to represent that the hours reported on the English-language time sheets
were precisely accurate.

[15] There are numerous inconsistencies between the first and second sets of records as to the hours
and wages of particular employees.  *Compare, e.g.*, Pl. Ex. 7(a) at 1148 (a time sheet submitted
in the second set of records showing that, during the week of January 20, 2008, Qi Wu worked
six shifts totaling 54 hours) *with* Pl. Ex. 2(f) at 905 (a time sheet submitted in the first set of
records showing that, during the week of January 20, 2008, Qi Wu worked four shifts totaling
24.63 hours).

employees almost always worked five or six shifts, each nine to 10 hours in duration, each week. But, as noted, even these records are still in tension with aspects of the trial testimony, including on the core proposition of whether wages were earned on an hourly or daily basis.

76. In sum, for the reasons stated, the Court finds the purported wage and hour records produced by defendants to the Department of Labor during the course of the investigation to be inaccurate, incomplete, and internally contradictory.

### IV. Wage and Hour Practices at Cindy's

77. During the relevant time period, Cindy's was generally open for business from 9:30 a.m. until 9:30 p.m. Employees for the most part were assigned to one of three daily work shifts, each scheduled to last approximately 10 hours in duration, although as noted, the employees generally testified that they worked somewhat in excess of 10 hours each day. Ms. Sim set the employees' work schedule, and created a document which set forth each employee's daily work hours. Defendants posted the weekly work schedule of Cindy's employees on an internal wall of the salon. Cindy's paid employees on a weekly basis, by check, cash, or a combination.

78. There are two findings of fact that are critical to the Secretary's overtime claims under the FLSA: (1) whether Cindy's employees worked overtime hours; and (2) if so, whether, as required by law, employees that worked overtime were compensated at one and one-half times the base rate for all hours worked in excess of 40 each week.

### A. *Did Cindy's Employees Work Overtime?*

79. The Court finds that Cindy's employees regularly worked hours in excess of 40 hours each week. This conclusion is supported by witness testimony, Cindy's wage and hour records, and ultimately, by defendants' admission to this effect at trial.

80.  First, all six employees who testified at trial stated that they regularly worked in excess of 40 hours each week.  They independently testified that each scheduled work shift was approximately ten hours long, and that they worked either five or six days each week.[16]  This testimony was not at all disturbed during cross-examination.  The employees also each testified that employees commonly worked longer than their scheduled 10-hour shifts.[17]  The Court credits this testimony.

81.  Second, wage and hour records produced by Cindy's ultimately substantiated that employees regularly worked overtime hours.  Cindy's second production reflected that in the vast majority of weeks, all employees worked more than 40 hours.  *See* Pl. Ex. 1(a)–(c). Although these time records do not precisely accord with employee testimony that daily hours tended to exceed 10 hours, the Court finds the second set accurate to the extent it reflects that employees were generally scheduled to work 10 hours a day, and five or six days a week.

82.  Third, the defendants ultimately stipulated that Cindy's employees regularly worked in excess of 40 hours per week.  *See* Joint Stip. of Fact ¶ 23–34 ("During the relevant time period, each of the daily work shifts . . . was approximately 10 hours in duration . . . [and] employees of Cindy's Total Care usually worked either five or six days per week").  Ms. Sim herself set the employees' work schedules and thereby knew what employees' hours were.  *See* Joint Stip. of Fact ¶ 22 ("During the relevant time period, the employees' work shifts were scheduled and set by Nam Saeng Sim.").

---

[16] *See* Ge Zhang Decl. ¶¶ 16, 22; Meng Decl. ¶¶ 17, 20; Wu Decl. ¶¶ 15, 19; Yeng Decl. ¶¶ 17, 20; Zhang Decl. ¶¶ 16, 21; Zhu Decl. ¶¶ 21, 25.

[17] *See* Ge Zhang Decl. ¶ 12; Meng Decl. ¶¶ 18, 26; Wu Decl. ¶¶ 17, 19, 27, 34; Yeng Decl. ¶ 19; Zhang Decl. ¶¶ 19, 22, 27; Zhu Decl. ¶ 23.

B.   _Were Cindy's Employees Paid for the Overtime Hours that They Worked?_

83.   The Court finds that Cindy's employees who worked overtime were not compensated at one and one-half times the base rate for all hours worked in excess of 40 each week.  This conclusion was overwhelmingly established, both by employee witness testimony, and by inferences reasonably drawn from the records defendants produced.

84.   First, Cindy's employees uniformly testified that they were paid a flat daily wage rate that did not include overtime wages.  Each employee witness testified that she regularly worked in excess of 40 hours per week, and was paid a flat daily wage—from approximately $60 to approximately $110—that did not vary based on the number of hours worked in any given day, or week.[18]  The Court credits this testimony.

85.   Defendants claimed that they paid employees an hourly wage rate, and compensated employees at the overtime rate for all hours worked in excess of 40 per week were.  _See_ Sim Decl. ¶¶ 11, 23, 25.  As support for this claim, defendants point to the time sheets submitted as part of Cindy's second production.  These state that employees received an hourly wage,[19] and

_____

[18] _See_ Tr. 53:4–5; 152:16–153:2; 160:13–16; Ge Zhang Decl. ¶ 28; Meng Decl. ¶¶ 27, 29; Wu Decl. ¶¶ 32, 34; Yeng Decl. ¶ 28; Zhang Decl. ¶ 28; Zhu Decl. ¶ 32.

[19] As purported evidence that Cindy's employees were paid an hourly wage, defendants point to the testimony of employee Hua Zhu, who testified on cross-examination that on two weeks she did in fact receive the total weekly wages indicated on the corresponding time sheets.  _See_ Tr. 176:4–180:18.  These were the time sheets from the week of December 7, 2008, in which Ms. Zhu worked five days and was paid $480, and from the week of December 14, 2008, in which Ms. Zhu worked six days and was paid $610.  Pl. Ex. 5(a) at 830.  Defendants argue that she could not have been paid a daily rate of $100 because that rate would have translated into $500 and $600, respectively, for those weeks.  But this is a far cry from demonstrating that Ms. Zhu was paid an hourly wage rate.  Ms. Zhu testified that she did not understand the calculations underlying the wages paid to her by Cindy's, but she clearly testified that the amount of her weekly pay turned on the number of days she had worked, not on her hours.  _See_ Tr. 206:1–6.  Another employee similarly described receiving slightly more than $600 for six days' work and

that hours over 40 were compensated at one and one-half times the base rate.  *See* Pl. Ex. 1(a)–

(c).  However, the employee witnesses consistently, and credibly, testified that the time sheets in

these records, although more closely reflecting their hours than Cindy's first production, do not

reflect their actual hours worked.  The employees further testified that they were never told of an

hourly wage; and that they never received overtime pay.[20]

86.  Moreover, although the second set of records—the time sheets that do reflect

overtime hours—do not appear to utilize the backing-in method characteristic of the first

production, the Court finds that these records are unreliable as to a separate issue: the amount of

the employee's weekly pay.  On their face, the time sheets produced in Cindy's second

production report the hours worked up to 40 per week (which hours are multiplied by the

purported hourly wage rate) and then the hours in excess of 40 (which hours are multiplied by

one and one-half times that wage rate) and those totals are added together to reflect the

employee's purported weekly wages.  However, the purported weekly wages reflected in the

second document production are contradicted by Cindy's check records.  During the relevant

period, Ms. Sim testified, employees were paid by check, cash, or a combination.  Where cash

was a component of the employee's compensation, there is no documentary way to establish the

wages in fact paid to the employee in any given week.  However, according to Ms. Sim's own

testimony, several employees were paid entirely by check, including the employees known to her

---

slightly under $500 for five days' work.  *See* Tr. at 15:11–16:4 (testimony of employee Qi Wu).
But a practice by Ms. Sim of modestly adjusting upward or downward an employee's weekly
wages on isolated occasions does not establish compliance with the duty to pay 150% of an
hourly wage rate for overtime wages.

[20] *See* Ge Zhang Decl. ¶ 28; Meng Decl. ¶¶ 27, 29; Wu Decl. ¶¶ 32, 34; Yeng Decl. ¶ 28; Zhang
Decl. ¶ 28; Zhu Decl. ¶ 32.

as Maria, Sharon, Jenny, Amy, Julie, and Sally.  *See* Tr. 452:19–453:8.  For those employees, one would expect that, if the time sheets in the second production were accurate, the paycheck for any given week should match the amount of total wages indicated on the employee's time sheet.  However, the records show no such thing.

87.  For example, the time sheets for Hua Zhu ("Maria") covering March 29, 2009 through September 12, 2009 indicate that she worked for six days per week, and either 53 or 54 hours each week during that period, without exception.  *See* Pl. Ex. 5(a), at 817–23.  On their fact, the time sheets state that Maria was paid a $10 hourly rate, and proper overtime pay for all hours worked in excess of 40 hours, for a total of $610 per week for each week in the period.[21]

88.  However, the checks paid to Maria during that period tell a different story.  The parties agree that Cindy's employees were paid once per week, generally at week's end.  The amount paid by Cindy's to Maria as reflected on the checks to her is, however, frequently well short of $610.  On July 18, 2009, Maria was paid only $537.04, *see* Def. Ex. 1 at 517; on May 23, 2009, Maria was paid only $349.40, *see id.* at 496; and on June 20, 2009, Maria was again paid only $349.40, *see id.* at 503.  In fact, *none* of the checks produced by Cindy's reflect that Maria was paid $610 for a week's work during that period.  On the contrary, the checks reflect that Maria was paid varying amounts for weeks in which she, according to Cindy's second production, worked the same number of hours.  The Court has reviewed the paychecks for other employees whom Ms. Sim testified were paid wholly by check.  These paychecks, too, consistently do not match the total wages reflected on the time sheets in Cindy's second production.  *See generally* Def. Ex. 1.

---

[21] Payment of $610 per week would reflect that overtime pay had properly been paid to a $10 per hour employee who worked 54 hours in the week.

89.   Thus, testimony at trial by Cindy's employees, as well as the defendants' own records of payment by Cindy's to its employees, overwhelmingly establishes that Cindy's employees were not compensated at one and one-half times the base rate for all hours worked in excess of 40 each week.

### V.   Defendants' Knowledge and Willfulness[22]

90.   The first issue as to knowledge is whether Ms. Sim knew that Cindy's employees were working more than 40 hours per week.  She clearly did.  As Cindy's sole owner, Ms. Sim set a schedule under which employees worked five or six days per week, and for at least 10 hours per day.  *See* Joint Stip. of Fact ¶¶ 22–24.  Cindy's, which Ms. Sim owned and operated, is charged with this knowledge.

91.   During the relevant period, Ms. Sim (and hence Cindy's), also clearly knew the pertinent requirements of federal law: (1) that Cindy's pay employees at one and one-half times their regular wage rate for all hours worked in excess of 40 hours per week, and (2) that Cindy's create and maintain accurate records of employees' wages and hours.  As a result of the 2006 investigation, which entailed similar allegations as to unpaid overtime and delinquent recordkeeping (*see* Lau Decl. ¶¶ 3–4; Sim Decl. ¶¶ 8–10), Ms. Sim signed, on or about March 2, 2007, a Back Wage Compliance and Payment Agreement, acknowledging violations of those FLSA requirements.  This agreement put Ms. Sim fully on notice of the FLSA's overtime wage and recordkeeping requirements as they applied to her business.  *See* Lau Decl. ¶ 5.  Further, Ms. Sim testified that, after the first investigation, she "was very aware that time and one-half had to be paid to all employees for any work performed after 40 hours in one week."  Sim Decl. ¶ 10.

---

[22] In light of the Court's finding that Mr. Kim was not proven at trial to be an "employer," *see infra* at 35–36, the Court does not address here Mr. Kim's knowledge and willfulness.

92.  As to willfulness, the Court finds overwhelming evidence—based on Ms. Sim's statements and conduct—that Cindy's violations of the FLSA's overtime and recordkeeping provisions during the relevant period were willful.  The fabrication of time sheets via the backing-in method is clear evidence of willfulness.  So, too, is Cindy's creation and submission of multiple wage-and-hour records for the same employees.  *See, e.g.*, Pl. Ex. 7(a) at 1148; Pl. Ex. 2(f) at 905.  In addition, various employees testified that Ms. Sim had given them multiple weeks' worth of time sheets at one time to complete and sign, long after the dates reflected on the time sheets had passed.[23]  This, at minimum, reflects Ms. Sim's willful noncompliance with the Act's recordkeeping requirements.  Finally indicative of willfulness is the evidence that, once alerted to the Department of Labor's latest investigation, Cindy's abruptly changed its recordkeeping practices.[24]

93.  In sum, the assembled evidence compellingly demonstrates longstanding and deliberate noncompliance by Cindy's with the requirements of the FLSA, and, once aware of regulatory scrutiny, an effort by Cindy's to cover up and conceal its noncompliance.  This element of willfulness is therefore amply established.

---

[23] Tr. at 130:15–24, 139:22–24, 248:4–14, Ge Zhang Decl. ¶ 12; Meng Decl. ¶ 20; Wu Decl. ¶¶ 19, 31; Yeng Decl. ¶¶ 20, 24–26; Zhang Decl. ¶ 21; Zhu Decl. ¶ 25.

[24] For example, the time sheets for Cindy's employee Yu Zhen Li indicate that she worked exactly 20 hours per week (one 6-hour shift and two 7-hour shifts) each week for 19 weeks from May 21, 2007 through September 28, 2007, earning a weekly salary of $150 per week.  *See* Pl. Ex. 2(f) at 789–98.  The Secretary filed the Complaint in this matter on September 20, 2011, with service executed thereafter.  Almost immediately thereafter, Cindy's time sheets for Ms. Li began to indicate that she was working exactly 40 hours per week each week during the 13 weeks spanning October 1, 2007 through December 29, 2007 (despite this being the time of year that employees testified was the slower season).  *See* Pl. Ex. 2(f) at 783–89.  This abrupt change immediately following the filing of the Complaint suggests consciousness of prior noncompliance on Cindy's part.

**VI. Credibility Determinations**

94.   Although in this case the documentary and circumstantial evidence of FLSA violations by Ms. Sim and Cindy's was compelling, the Court also paid close attention to the credibility of the trial witnesses.  The Court's judgment is that the employee witnesses and Department of Labor witnesses were, in general, significantly more credible than Ms. Sim or Mr. Shin.

95.   Credibility determinations can be of great importance in cases where, as here, there are conflicting accounts as to workplace procedures and the authenticity of documents.  In this case, credibility determinations were complicated by language barriers.  Nearly all of the witnesses (including all the employee witnesses) testified in either Mandarin or Korean; their testimony was conveyed to the Court by a translator.  Thus, the Court, as factfinder, lacked direct access to some of the linguistic cues or nuances of expression that can bear on a witness's veracity.  In many instances, answers to questions on cross-examination questions were non-responsive, in a way that strongly suggested to the Court that the thrust of a question had been, quite literally, lost in translation.

96.   Despite these general difficulties, several important observations relating to credibility could be made.  First, defense counsel did succeed in eliciting testimony from employee witnesses that, in some respects, was inconsistent with other employees' testimony.  These inconsistencies were on subjects such as the total number of employees that generally worked at Cindy's on a given day, the approximate number of customers serviced by a salon employee on a typical day, and the dates when Cindy's corporate name changed.  The Court has given considerable thought to whether these inconsistencies call into question the employees' veracity as to the central issues here, relating to whether wages were paid on an hourly basis and

[28]

whether overtime pay was properly compensated.  The Court has concluded that they do not.  Rather, the Court attributes these testimonial weaknesses to factors including language and translation difficulties; the witness's unfamiliarity and discomfort in a courtroom setting, including due to foreign birth, limited education, unfamiliarity with the U.S. legal system, and the awkwardness of testifying against a current or former employer; and imperfections or ambiguities in the question put to them on the witness stand.  The Court is also mindful that the employee witnesses are immigrants living within a relatively closed community and work or worked for an employer, Ms. Sim, with whom they do not share a common language.  Under these circumstances, testimonial shortcomings that might otherwise have signified a lack of credibility did not do so here.  The Court's assessment is that the employee testimony was, in the main, quite credible.

97.  Importantly, the testimony of the employee witnesses was strikingly consistent with respect to the core propositions in this case.  All six employee witnesses testified that they were paid a flat daily wage rate, not an hourly rate.  All six testified that although they had at various times, at Ms. Sim's direction, signed time sheets provided to them by Ms. Sim, the hours stated on the time sheets understated the number of hours actually worked.  All six testified that they did not receive a daily break of one hour in duration, as reflected in many of the time sheets prepared by Ms. Sim, and that breaks were much shorter.  All six testified that Ms. Sim had never said anything to them about an hourly wage, but had instead given each a daily wage rate.  And finally, all six testified that they were never given overtime pay for hours worked in excess of 40 hours each week.

98.  Thus, the Court's overall determination as to the employee witnesses is that, despite some inconsistencies largely as to secondary matters, their accounts of Cindy's employment

[29]

procedures were generally accurate.  Taken as a whole, but without endorsing every detail of each witness's testimony, the Court finds the testimony of the witnesses for the Secretary credible.

99.   The substance of Ms. Sim's testimony, by contrast, was convincingly impeached. Her direct testimony consisted largely of a written declaration—the Secretary declined to cross-examine her.  Defense counsel was permitted, at trial, to supplement Ms. Sim's direct testimony by putting limited additional live questions to her.  But there were gaping inconsistencies between Ms. Sim's written testimony and the other evidence adduced at trial, evidence which the Court credits.  For a variety of reasons, the Court does not credit Ms. Sim's testimony on the factual issues that are critical to this case.

100.   First, Ms. Sim's testimony regarding recordkeeping and wage and hour practices at Cindy's must be viewed with suspicion because it contradicted her prior statements to investigators.  On May 27, 2009, Ms. Sim stated clearly to the Department of Labor's Mr. An, in her native language, that she did not make or maintain wage and hour records for Cindy's employees.  *See* An Decl. ¶ 5.  On June 15, 2009, Ms. Sim again told Ms. Lau that she did not make or maintain such records; she insisted that she knew each employee's hours worked "by memory."  Lau Decl. ¶ 14.  The Court fully credits Mr. An and Ms. Lau's testimony reporting these earlier statements of Ms. Sim.  At trial, Ms. Sim contradicted those statements, testifying that she has "kept records in the ordinary course of Cindy's business," and despite difficulties in achieving total accuracy, "for the most part . . . the records are accurate."  Sim Decl. ¶¶ 13, 15. In light of Ms. Sim's earlier statements to the contrary, her self-serving trial testimony to the effect that she had complied with the FLSA is rejected as lacking credibility.

[30]

101.  In addition, for the reasons given earlier, the time sheets that Ms. Sim produced and vouched for as accurate in fact were demonstrably not so.  Aware of the irregularities in these employment records, the Court, at trial, invited Ms. Sim to explain why some employee hours were reported in unusual fractions.  *See* Pl. Ex. 2(f) (showing Qi Wu to have worked 14.38 hours in one week); Tr. 453:9–456:22.  Ms. Sim's only explanations were that there may have been a miscalculation, and that her old age may have impaired her ability to keep accurate records.  *See* Tr. 456:14–17.  These explanations were totally unpersuasive.  There are numerous irregular fractions of hours throughout the time sheets that Cindy's produced, such that Ms. Sim's account of an isolated miscalculation is not credible.  Rather, as noted, these irregular hour totals strongly suggest a systematic practice of "backing-in" fabricated hours.  Further, Ms. Sim's age (57) is not a credible explanation for her failure to maintain accurate records.

102.  Also undermining Ms. Sim's credibility were her prior false statements to federal investigators about Cindy's wage and hour practices.  As noted, Ms. Sim twice denied (on both May 27, 2009 and June 15, 2009) that any employees worked more than 40 hours per week.  *See* An Decl. ¶ 5; Lau Decl. ¶ 14.  At trial, however, the defense stipulated to the contrary.

103.  On the decisive factual issues in this case, Ms. Sim was thus demonstrably inconsistent, in pointed contrast to the employee witnesses.  Ms. Sim's pattern of supplying fabricated documents, and giving dubious and shifting explanations, was inconsistent with truth-telling.  Instead, Ms. Sim's interview answers, document productions, and ultimately, trial testimony bespoke a series of short-term attempts to parry the inquiry at hand in the hope of avoiding enforcement action or liability, without any regard for the truth.  The Court therefore emphatically rejects her testimony.

CONCLUSIONS OF LAW

**I.  Jurisdiction**

1.  Section 17 of the FLSA states: "The district courts . . . shall have jurisdiction, for cause shown, to restrain violations of section 215 of this title, including . . . the restraint of any withholding of payment of minimum wages or overtime compensation found by the court to be due to employees under this chapter."  29 U.S.C. § 217.  There is no question—and defendants do not contest—that § 217, as well as U.S.C. §§ 1331 and 1345, provides this Court with subject matter jurisdiction.  *See* Joint Pretrial Order, Stipulations of Law ¶ 1 ("Joint Stip. of Law").

**II.  Cindy's is an Enterprise Engaged in Interstate Commerce under the FLSA**

2.  The FLSA applies to all employees employed by an enterprise engaged in interstate commerce.  *See* 29 U.S.C. §§ 206(a), 207(a).  An entity is an enterprise when "the related activities performed by any person or persons are for a common business purpose."  29 U.S.C. § 203(r)(*l*).  An enterprise is "engaged in commerce" where its employees engage in commerce or handle, sell, or otherwise work on goods and materials that have been moved in commerce, and where the enterprise has at least $500,000 in annual gross volume of sales made or business done.  *See* 29 U.S.C. § 203(s)(*l*).

3.  Cindy's is an enterprise.  First, Cindy's is operated for a common business purpose as a nail salon.  *See* Tr. 91:23–92:2, 47:24–48:5, 173:5–6; Joint Stip. of Fact ¶ 4; Sim Decl. ¶ 2.[25]

_____

[25] Cindy's has operated at multiple locations and under multiple corporate names in the relevant period.  The salon is currently located at 491 Amsterdam Avenue, New York, N.Y.  Prior to operating at the current location, it was located at 170 West 83rd Street, New York, N.Y., where it provided the same services to customers.  Cindy's employees have worked at both nail salon locations.  *See, e.g.*, Zhang Decl. ¶ 10; Zhu Decl. ¶¶ 10, 13.

[32]

Second, Cindy's nail salon has always been under the common control of defendant Ms. Sim.[26]

Third, Cindy's activities have always been "related."[27]

      4.   Cindy's Total Care, Inc. is also engaged in commerce.  First, Cindy's has used goods

and materials that have been moved in commerce.  *See* 29 U.S.C. § 203(s)(*l*).  The parties have

stipulated that Cindy's has purchased, and Cindy's employees have used, material and supplies

in the salon that were procured from beauty supply distributors located outside the state of New

York.  *See* Joint Stip. of Fact ¶¶ 15–16.  Second, as discussed earlier, Cindy's exceeded

$500,000 in gross annual sales for the years 2007–2010.  *See supra*, at 4 n.2; *see also* Def. Ex. 1

(Cindy's credit card statements, reflecting daily, weekly, and monthly credit card settlement

deposits made into Cindy's bank account); Pl. Ex. 12(i) (Cindy's IRS Form 1140 corporate tax

returns for 2008 and 2009).

### III. Ms. Sim and Cindy's Are Employers Subject to the Requirements of the FLSA

      5.   The FLSA defines "employer" broadly as "any person acting directly or indirectly in

the interest of an employer in relation to an employee." 29 U.S.C. § 203(d).  When determining

whether a person is an "employer" for purposes of the FLSA, "the overarching concern is

whether the alleged employer possessed the power to control the workers in question, . . . with an

eye to the 'economic reality' presented by the facts of each case."  *Herman v. RSR Sec. Servs.*

*Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999) (quoting *Goldberg v. Whitaker House Coop.,* 366 U.S. 28,

---

[26] Ms. Sim owned and operated Cindy's at both the current and previous locations.  *See* Zhang
Decl. ¶¶ 10–11; Zhu Decl. ¶¶ 11–13.

[27] *See* 29 C.F.R. § 779.207 ("[w]hether on the same premises or at separate locations, the
activities involved in retail selling of goods or services, of any type, are related activities and
they will be considered one enterprise where they are performed through unified operation or
common control, for common business purpose.").

33 (1961)).  The Second Circuit has instructed that the "economic reality" test compels courts to

consider a range of factors in resolving whether a defendant qualifies as an employer under the

FLSA, including "whether the individual: '(1) had the power to hire and fire the employees, (2)

supervised and controlled employee work schedules or conditions of employment, (3)

determined the rate and method of payment, and (4) maintained employment records.'" *Gillian

v. Starjem Restaurant Corp.*, No. 10-cv-6056, 2011 WL 4639842, at *4 (S.D.N.Y. Oct. 4, 2011)

(citing *Carter v. Dutchess Community College,* 735 F.2d 8, 12 (2d Cir. 1984)).  "No one of the

four factors standing alone is dispositive.  Instead the 'economic reality' test encompasses the

totality of circumstances, no one of which is exclusive."  *Herman*, 172 F.3d at 139 (internal

citation omitted).

6.  An individual may simultaneously have multiple "employers" for the purposes of the

FLSA.  *See* 29 C.F.R. § 791.2(a) (if the facts demonstrate that the employee is jointly employed

by more than one employer, then "all of the employee's work for all of the joint employers

during the workweek is considered as one employment for purposes of [FLSA]").  Each

defendant is jointly and severally liable for all back wages and liquidated damages.  *Moon v.

Kwon et al.*, 248 F. Supp. 2d 201, 236 (S.D.N.Y. 2002).

7.  Ms. Sim is clearly an employer of the employees of Cindy's, including all those

whose rights to overtime pay the Secretary seeks to vindicate here.  At all times relevant to this

action, Ms. Sim was the sole owner, sole officer, and president of Cindy's Total Care, Inc., and

had the power to hire and fire employees, control the conditions of their employment, and

determine the rate and methods of their pay.  The evidence presented at trial also showed, and

defendants did not contest, that Ms. Sim is a corporate officer of Cindy's Total Care, Inc. who

exercised control over the operations of the nail salon and its employees.

[34]

8.  On the record before it, however, the Court cannot find that defendant Byung Sook

Kim, Ms. Sim's husband, was an employer of the employees of Cindy's Total Care, Inc.  The

evidence presented by the Secretary, including the testimony of the six employee witnesses

whom she called, did not establish that Mr. Kim had operational control over the nail salon or its

employees.  Mr. Kim was not a corporate officer of Cindy's Total Care, Inc. at any time relevant

to this action.  Nor did any witnesses testify that Mr. Kim had the power to hire and fire Cindy's

employees.  Nor did the Secretary offer any evidence that, during the relevant period, Mr. Kim

was paid by Cindy's, let alone for any management or operational work.  Apart from sitting with

Ms. Sim and providing her with occasional spot assistance, the evidence does not establish that

he was involved in the day-to-day management of the salon.

9.  The Secretary appears to base the claim that Mr. Kim was an employer primarily on

the fact that Mr. Kim occasionally handed out pay to the employees, posted break schedules on

the wall at the salon, and sat at the check-out register while visiting with his wife, Ms. Sim.  The

parties have stipulated that Mr. Kim "has occasionally written out paychecks to Cindy's

employees," and that at "at the direction of defendant Nam Saeng Sim [he] . . . has handed

checks to Cindy's employees [and] . . . requested Cindy's employees to sign a receipt indicating

that they received their wages."  Joint Stip. of Fact ¶¶ 18–20.  But these actions establish that Mr.

Kim at times assisted Ms. Sim in her management of the salon.  They are not sufficient to show

any independent managerial control by Mr. Kim over its employees.  Indeed, the Secretary has

acknowledged that, to the extent Mr. Kim assisted in paying the employees, it was always "at the

direction of" Ms. Sim.  Joint Stip. of Fact ¶¶ 19–20.  No evidence was offered to support the

Secretary's proposed finding that Mr. Kim himself ever determined the rates of compensation for

Cindy's employees.  Accordingly, the Court finds that Mr. Kim was not an "employer" of Cindy's employees.

### IV. Ms. Sim and Cindy's Violated Federal Recordkeeping Laws

10.  Under the FLSA, every employer is required to "make, keep, and preserve such records of the persons employed by [it] and of the wages, hours, and other conditions and practices of employment."  29 U.S.C. § 211(c).  Although the terms "wages" and "hours" each have a clear meaning, the term "other conditions and practices of employment" is not entirely self-defining, and therefore has been given content by regulations promulgated by the Department of Labor.  These regulations list the specific conditions and practices of employment all employers are required to document.  *See* 29 C.F.R. §§ 516.2, 516.5, 516.6.  These include: employees' regular hourly rate, hours worked each workday, total hours worked each week, total additions or deductions from wages, total wages paid each pay period, the date of payment, and the pay period covered by each payment.

11.  For the reasons set forth in detail above, during the relevant time period, Ms. Sim and Cindy's violated the recordkeeping provisions of the FLSA.  They failed to make, keep, and preserve adequate and accurate records of the wages and hours of their employees as required by the relevant regulations.  The records produced by Cindy's were facially inaccurate and inadequate, and there is no evidence that appropriate records were kept and maintained pursuant to the requirements of the FLSA.

### A.  *Cindy's Records Were Facially Inadequate*

12.  The hour and wage records created by Cindy's were plainly inadequate, even apart from their falsity.  The records produced to the Department of Labor in the course of the investigation, and to the Court during this litigation, simply do not provide employment

[36]

information for all employees for all weeks worked.  Rather, the Court has noted numerous gaps in the submitted time sheets.  *See* 29 C.F.R. §§ 516.2, 516.5.  That is particularly true of Cindy's first production, but it is true as well of the second.  The records produced by Cindy's failed to cover all dates in the relevant time period, and they failed to cover all employees employed by Cindy's during that time.

### B.  *Wage and Hour Information in the Records Have Been Shown to be False*

13.  More fundamentally, as detailed above, much of the wage and hour information provided in the records produced by Cindy's is demonstrably inaccurate.  The time sheets in Cindy's first production misrepresent the total hours worked by employees, with numerous time sheets describing work shifts that last five or six hours in duration, contrary to the uniform testimony of the employee witnesses (and the parties' stipulation) that a standard shift at Cindy's was approximately 10 hours in duration.  And, as described earlier, the Court finds that the total hours and wages rates on time sheets were fabricated—through the "backing in" method—to create the illusion of compliance with the FLSA.  *See* Joint Stip. of Fact ¶¶ 23–24.

14.  As to the time sheets in Cindy's second production, although less glaringly inaccurate, they are far short of compliant.  As described earlier, the aggregate weekly wages reported for various (and possibly all) employees are incorrect, again, to create the false impression that overtime wages had been paid.  The time sheets are also incorrect insofar as they represent that each employee received a daily one-hour lunch break; and insofar as they represent that each employee started and ended work at the same time each day.  The employee witnesses testified, credibly, that they frequently arrived at (and began) work early, and continued to work after the official ending time of their shift, without receiving credit for the additional time.  Most

important, as noted, the records are false to the extent that they indicate that the employees were paid an hourly wage rate, and were paid overtime rates for overtime work.

### C.   Records Were Not Maintained in a Central Location

15.   During the relevant time period, Ms. Sim and Cindy's failed to maintain a complete and accurate set of records at the place of employment or at an established central recordkeeping office.  *See* 29 C.F.R. § 516.7.  Apart from the fact that Ms. Sim initially denied keeping any such records at all, at trial, Ms. Sim herself admitted that she had been unable to provide records to the Department of Labor during the third investigation because some of the records were kept at her home, some were kept at Cindy's nail salon, and some were kept at the office of the accountant, Mr. Shin.  *See* Sim Decl. ¶ 16.

### V.  Ms. Sim and Cindy's Violated Federal Overtime Pay Laws

16.   The FLSA requires employers to pay employees an overtime rate of at least one and one-half times their regular rate for hours worked in excess of 40 hours per week.  *See* 29 U.S.C. § 207(a)(1); 29 C.F.R. § 778.107; *Tran v. Alphonse Hotel Corp.*, 281 F.3d 23, 31 (2d Cir. 2002). The Court has found that no such overtime wages were paid here.  Nor may Cindy's claim that overtime wages were somehow tacitly embedded in employees' daily wages.  As a matter of law, a daily or a weekly salary does not include an overtime premium for the hours worked in excess of forty hours per week, unless there is evidence that the parties intended such an arrangement and that an explicit agreement was made.  *Chan v. Sung Yue Tung Corp.*, 2007 WL 313483, at *23 (S.D.N.Y. Feb. 1, 2007).  Thus, "[t]here is a rebuttable presumption that a weekly salary covers 40 hours; the employer can rebut the presumption by showing an employer-employee agreement that the salary cover a different number of hours."  *Giles v. City of New York*, 41 F. Supp. 2d 308, 317 (S.D.N.Y. 1999).  There was no evidence of such an agreement with respect

[38]

to the fixed daily wage rates paid here.  On the contrary, Ms. Sim denied paying such rates, falsely claiming that employees were paid hourly.

17.  In calculating the amount of overtime due under the FLSA, it is axiomatic that employees must be compensated for all hours worked.  This includes periods of down-time while waiting for customers.  *See* 29 C.F.R. § 778.223 ("working time is not limited to the hours spent in active productive labor, but includes time given by the employee to the employer even though part of the time may be spent in idleness"); 29 C.F.R. § 785.11; *Grochowski v. Phoenix Const.*, 318 F.3d 80, 87 (2d Cir. 2004); *Reich v. N.Y.C. Transit Auth.*, 45 F.3d 646, 651 (2d Cir. 1995); *Yu G. Ke v. Saigon Grill, Inc.*, 595 F. Supp. 2d 240, 255–56 (S.D.N.Y. 2008).  It also includes work breaks approximately of 20 minutes or less in duration.  *See* 29 C.F.R. § 785.18.  Because the Court finds that breaks above 20 minutes were not regularly taken at Cindy's, it follows that employees' compensable hours extend from the start time of the employee's workday to the end time, with no time excluded.

18.  The Court finds that Cindy's and Ms. Sim failed to pay overtime compensation during the period covered by this action, which, as narrowed during the litigation, spanned September 20, 2007 through February 28, 2010.  The employees in question were entitled to be paid but did not receive overtime pay at a rate of not less than one and one-half times the minimum wage for any hour worked in excess of 40 hours per week.  *See* 29 U.S.C. §§ 207(a)(1), 216; *see also Chao v. Gotham Registry, Inc.*, 514 F.3d 280, 285 (2d Cir. 2008).  The defendants thus violated Section 7 and Section 15(a)(2) of the FLSA by paying their employees a fixed daily wage, without any provision for overtime.

19.  Accordingly, the Secretary is entitled to recover, as damages for the affected employees, the difference between the amount that these employees were paid and the amount that they would have received had overtime been properly paid.

## VI. Damages

### A.  *Statute of Limitations*

20.  Cindy's and Ms. Sim can be liable for only those damages that accrued under the FLSA on or after September 20, 2007.  *See* 29 U.S.C. §255(a) (where violation is willful, three-year statute of limitations, running from the date the cause of action accrued, applies).  The narrowed period of time for which the Secretary seeks relief (September 20, 2007 through February 28, 2010) accords with this standard.

### B.  *Employees' Entitlement to Compensatory Damages*

21.  An employee seeking to recover unpaid overtime wages under the FLSA "has the burden of proving that he performed work for which he was not properly compensated." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946).  However, where an employer fails to maintain adequate records of the employee's hours worked, wages earned, and other terms and conditions of employment as required by the FLSA, the employee is found to satisfy this burden if he or she can prove that the employee "in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference."  *Id.*; *see also Moon v. Kwon et al.*, 248 F. Supp. 2d 201, 219 (S.D.N.Y. 2002) (citing *Reich v. Southern New England Telecomms. Corp.*, 121 F.3d 58, 66 (2d Cir. 1997)).  Here, the record establishes, and the Court has found, that Cindy's did not maintain adequate records.  The question thus is whether the Secretary has met her burden, including by "just and reasonable inference," of proving the overtime hours worked

[40]

(but not properly compensated) as to the 32 individuals employed by Cindy's during the relevant time period.

22.   Here, the Court finds that the Secretary has met her burden.  First, she has presented the reliable testimony of a representative sample of employees, establishing a pattern and practice of FLSA violations by Cindy's and Ms. Sim.  This evidence supplies a reasonable, and indeed a compelling, basis to extrapolate that all other employees were similarly denied overtime pay during the relevant period.  Cindy's at no point has claimed that differing mechanisms were used to calculate the pay of those employees who testified as opposed to those who did not.

23.   Second, as to all 32 employees, the Secretary has presented evidence that, in totality, supplies a reasonable basis on which the Court can determine which employees worked overtime at Cindy's during the relevant period, how many overtime hours each employee worked, and what each employee's wages were (converted to hourly wages) so as to permit a calculation of the amount of unpaid overtime wages due to them.  These are the ingredients necessary to compute damages.

24.   As to the period of time that each particular employee worked, Ms. Sim confirmed during her testimony at trial that the 32 employees each worked during the period as to which the Department of Labor is seeking overtime compensation for them.  *See* Tr. 469:2–473:24; *see also* Pl. Ex. 2(q) (chart setting out period of employment for each employee for which Secretary sought recovery as of date of trial); Pl.'s Post-Trial Br., Ex. 1 (chart prepared post-trial, in response to inquiry from Court, in which the Secretary set out narrowed periods of employment for these employee).  Thus, the period of employment for each employee, within the relevant period, is not in dispute.

[41]

25.  As to the length of each workday, the parties stipulated that employees' assigned shifts were 10 hours long.  *See* Joint Stip. of Fact ¶ 23.  Although there was ample testimony from employees that the workday in fact frequently exceeded 10 hours, the Court, in calculating damages, will make the conservative assumption of a 10-hour workday.

26.  As to the number of days employees worked each week, the parties stipulated at trial that each employee worked five or six days a week.  *See* Joint Stip. of Fact ¶¶ 23–24.  The employee testimony was that six-day weeks were worked during the busier months (which employees testified were March through September) whereas five-day weeks were worked during the other five months of the year.  *See* Ge Zhang Decl. ¶ 22; Meng Decl. ¶ 20; Wu Decl. ¶ 19; Yeng Decl. ¶ 20; Zhang Decl. ¶ 21; Zhu Decl. ¶ 25.  The Court will calculate damages based on a 60-hour workweek for seven months of each year (March through September) and a 50-hour workweek for five months of each year (October through February), consistent with that testimony.

27.  Finally, as to the imputed wage rate to be used for determining damages attributable to unpaid overtime, the six employee witnesses identified in their direct testimony the daily wage rate that Ms. Sim had assigned to them.  In calculating damages, the Secretary proposes, and the Court agrees, that it is appropriate to calculate an imputed hourly rate for each of these employees by dividing each employee's daily wage rate by 10 hours (the length of the workday to which the parties have stipulated).  That imputed hourly rate may then be used as the basis for calculating unpaid overtime for the hours the employee worked in excess of 40 in a given week.  As to the other 26 employees, there is, of necessity, no testimony regarding the daily rate that Ms. Sim assigned to each of them.  However, Cindy's second document production does supply, on the time sheets for each employee, a purported hourly rate—the rate that Cindy's claimed was

[42]

in place for that employee during the relevant period.   Although the Court has found that rate to

be a post-hoc construction, the Secretary proposes, and the Court agrees, that, for damages

purposes, that rate to be a fair proxy for an hourly rate for damages purposes.  *See Anderson*, 328

U.S. at 687 ("an employee has carried out his burden if he proves . . . the amount and extent of

that work as a matter of just and reasonable inference"); *Kuebel v. Black & Decker Inc.*, 643 F.3d

353, 362 (2d Cir. 2011) ("[i]t is well settled among the district courts of this Circuit" that an

employee can meet this low burden even "through estimates based on his own recollection").

The Court notes that the rates that appear on the time sheets in the second document production

are consistent with the range of wage rates to which the six employee witnesses testified.[28]

28.  Because the Secretary has presented sufficient evidence of the pattern and extent of

overtime pay violations, "[t]he burden then shifts to the employer to come forward with evidence

of the precise amount of work performed or with evidence to negative the reasonableness of the

inference to be drawn from the [plaintiff's] evidence."  *Anderson*, 328 U.S. at 687–88.  Cindy's

and Ms. Sim have not met this burden.  Indeed, they do not dispute that any of the 32 employees

worked on the days, and hours, on which the Secretary's damage calculation is based.  Nor, in

fact, do they dispute the Secretary's damages calculation at all.

### C.  *Compensatory Damages Calculation*

29.  The Secretary's damages calculations (defendants offer none), were arrived at as

follows.  First, Ms. Lau determined the total number of hours worked by each employee each

---

[28] As a further assurance of fairness to Cindy's in the damage-calculation process, to the extent
the time sheets she produced recite multiple hourly wage rates for a particular employee, the
Court believes it appropriate to use the lowest of these wage rates as the basis for calculating
unpaid-overtime damages.  However, to the extent, if any, that the wage rates given on these
time sheets fall below the then-applicable minimum wage required by law, the Court's view is
that the minimum wage should be used as the basis for calculating such damages.

week, as reflected in the time sheets provided by Cindy's in the second production.  Second, she multiplied the total hours worked by a standard coefficient obtained from the chart contained in a form, Form WH-135 ("Coefficient Table for Computing Extra Half-Time for Overtime") used by the Department of Labor's Wage and Hour Division for such purposes.  *See* Pl. Ex. 2(o).  For each week's hours for a given employee, exceeding 40 and up to 85, the chart on Form WH-135 supplies a coefficient rounded to three decimal numerals, which assists in computing the total overtime owed for the week.

 30.  The Court is convinced that, on the facts at hand, this is not the best method to calculate compensatory damages in this case.  First, no explanation is provided in any of the Secretary's testimony as to the method by which the Department of Labor produced the guidance document, nor how each coefficient is calculated by the Department of Labor in the first instance.  Second, the rounding of the standard coefficients in Form WH-135 to three decimal numerals creates unnecessary errors in the computation of owed overtime wages.  Such errors are demonstrated in the Secretary's own submissions.  In Ms. Lau's explanation of back wage computations, she describes an example for calculations made to determine the overtime wages owed to Hua Zhu, also known as Maria. *See* Pl. Ex. 2(r).  Ms. Lau multiplied the weekly wage rate ($600) by the coefficient value in the guidance document associated with a 60-hour week (0.167), which garnered a result of $100.20 of additional weekly half-wages owed to Maria.  *See id.* at 3.  However, when Ms. Lau detailed the alternative long-hand calculation in the same situation, she obtained a result of $100.00 of additional weekly half-wages owed.  *See id.* at 3 n.3.  While the difference is small in the example provided by Ms. Lau – just twenty cents for one week's work – when compounded by 32 employees over a time period of multiple years, the error may well be consequential, from the perspective of the under-compensated employee.

[44]

31.  In lieu of Ms. Lau's approach of relying on the coefficients in the Department's guidance materials, the Court's view is that overtime wages (and hence compensatory damages) for the 32 disadvantaged employees in this case are properly calculated by longhand, based on the factual parameters discussed in paragraphs 22–27 above.  The Court directs the Secretary to calculate those damages and to file with the Court, by January 20, 2012, (1) a memorandum setting forth, for each employee, concretely how those damages were calculated, so as to permit the defense and the Court to determine expeditiously if any arithmetic error was made; and (2) a proposed judgment embodying the aggregate damages due to each of the employees. Thus, in calculating total overtime wages with respect to the six employee witnesses, the Secretary is instructed to use the daily wage rate to which that employee testified in her direct testimony.  In calculating total overtime wages owed to the other 26 employees, the Secretary shall use the lowest hourly wage attributed to that employee in the time sheets supplied by Cindy's in her second production of documents, provided that that wage rate is not below the then-applicable minimum wage rate to which that employee was entitled.[29]

32.  Defendants may submit to the Court, also by means of a memorandum, due by January 27, 2012, any objections to the Secretary's proposed overtime wage calculations.

---

[29] Put in equation form, the longhand calculation that the Secretary shall utilize (for a hypothetical employee with a consistent wage rate during the relevant period) is as follows:

Step 1: [daily wage] x [days worked in one week] ÷ [hours worked in one week] = [reconstructed hourly rate of pay]

Step 2: [hourly pay] x 0.5 = [half-time overtime wage rate for all hours over 40]

Step 3: [half time hourly rate] x [number of hours worked over 40] = [half-time overtime wages owed for the week]

Step 4: [half-time wages owed for the week] x [number of weeks for which the employee worked the same number of hours and received the same weekly rate] = [total half-time overtime wages owed for the period].

D.  *Employees' Entitlement to Liquidated Damages*

33.  The defendants are liable for liquidated damages under the FLSA.  An employer who violates the overtime provisions of the FLSA "shall be liable to the employee or employees who are affected in the amount of their . . . unpaid overtime compensation, . . . and in an additional equal amount at liquidated damages."  29 U.S.C. § 216(b).  These statutory damages are not a sum certain, but rather are derivative of compensatory damages.

34.  Though "[d]ouble damages are the norm," *Southern New England Telecommc'ns*, 121 F.3d at 71, an employer may avoid liquidated damages if it establishes "by 'plain and substantial' evidence, its subjective good faith and objective reasonableness.'"  *Moon v. Kwon et al.*, 248 F. Supp. 2d 201, 234 (S.D.N.Y. 2002).  Courts may exercise discretion and deny an award of liquidated damages where the employer shows that even in violating statutory and regulatory wage, hour, and recordkeeping requirements, the employer acted in subjective "good faith" and had objectively "reasonable grounds" for believing that the unlawful acts did not violate the FLSA.  29 U.S.C. § 260.

35.  Defendants have not established that they acted in good faith in violating the FLSA. Quite the contrary:  The defendants knew of the overtime pay and recordkeeping requirements of the FLSA following the Department of Labor's initial investigation, evidenced by the Back Wage Compliance and Payment Agreement and the ensuing payment of back wages to the Department.  As such, defendants have shown neither a subjective belief in the lawfulness of their hour and wage practices, nor that these practices were objectively reasonable.  The Court also notes that, by virtue of the outcome of the first investigation, Ms. Sim is a recidivist as to FLSA violations, which is also inconsistent with a finding of good faith.

[46]

36.  Accordingly, Cindy's Total Care, Inc. and Ms. Sim are liable for the full amount of liquidated damages under the FLSA.  As liquidated damages, the Secretary is entitled to recover on behalf of each Cindy's 32 disadvantaged employees the equivalent to 100 percent of the compensatory damages due to that employee for unpaid overtime, as calculated pursuant to the discussion above.

37.  The Secretary shall include an appropriate entry for liquidated damages due to the 32 employees in the proposed judgment due to the Court by January 20, 2012.

## VII.    Joint and Several Liability

38.  Cindy's Total Care, Inc. and Nam Saeng Sim are jointly and severally liable for the judgment.  Each defendant (with the exception of Byung Sook Kim, for the reasons discussed above) acted as the employees' joint employer and is responsible both individually and jointly for defendants' violations of the FLSA and regulations promulgated thereunder.  *See* 29 C.F.R. § 791.2.

## CONCLUSION

In consideration of the foregoing findings of fact and conclusions of law, the Court finds that the plaintiff Secretary of Labor has proven, by a preponderance of the evidence, that defendants Cindy's Total Care, Inc. and Nam Saeng Sim violated the Fair Labor Standards Act, both in failing to pay overtime wages for weekly hours in excess of 40, and for failing to make and maintain appropriate records as to employees' hours and wages.  The Court does not find defendant Byung Sook Kim liable.

For the violation of the overtime-wage provisions of the FLSA, the Court awards plaintiff compensatory and liquidated damages, to be distributed to the 32 employees whom the Court has found to have been denied overtime pay.  Cindy's Total Care, Inc. and Nam Saeng Sim are

[47]

jointly and severally liable for paying these damages. Plaintiff shall submit proposed damages calculations for each of the 32 employees to the Court, consistent with the discussion in this opinion, by January 20, 2012; defendants may object to such calculations by January 27, 2012.

The Court further enjoins Cindy's Total Care, Inc. and Nam Saeng Sim, their officers, agents, employees and those persons in active concert or participation with defendants, from violating the provisions of the Act contained in 29 U.S.C. §§ 207, 211(c), 215(a)(2), 215(a)(5).

It is hereby ORDERED that judgment is entered in favor of plaintiff, Secretary of Labor, and against defendants, Cindy's Total Care, Inc. and Nam Saeng Sim. Judgment is entered in favor of defendant Byung Sook Kim, whom the Court finds is not liable for violating the FLSA.

Plaintiff shall submit an application for the amount of their fees and costs, a request for prejudgment interest, and an appropriate form of a judgment no later than January 20, 2012. The defendants shall submit any opposition to this submission no later than January 27, 2012.


SO ORDERED.

Paul A. Engelmayer
Paul A. Engelmayer
United States District Judge


Dated: January 5, 2012
       New York, New York

[48]